UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                              Case No: 07-20417

v.

                                              Honorable Victoria A. Roberts

D-3    SERGIO MURILLO,

        Defendant.

_____/

## OPINION AND ORDER GRANTING
## MOTION TO VACATE

**I.     INTRODUCTION**

This matter is before the Court on Petitioner Sergio Murillo's Motion to Vacate, Set Aside, or Correct his sentence pursuant to 28 U.S.C. § 2255. On September 30, 2011, the Court held an evidentiary hearing and addressed whether the performance of Petitioner's trial counsel, Andrew Leone, was constitutionally deficient for failure to investigate and call available alibi witnesses.

The Court concludes that Petitioner's Sixth Amendment right to effective assistance of counsel was violated during his trial. Petitioner's Motion is **GRANTED**.

**II.    BACKGROUND AND PROCEDURAL HISTORY**

    **A.    Petitioner's Trial and Appeal**

On July 8, 2007, DEA agents in Michigan stopped a white pickup truck suspected to be transporting cocaine. After a police trained dog alerted positively to the rear of the

1

truck, the truck was towed to a DEA facility.  Agents discovered approximately 11 kilograms of cocaine.  The driver of the truck, Virginia Nash, and the passenger, Juan Nunez, were arrested.

When arrested, Nash said that Petitioner and his brother hired her to drive from Michigan to California and back.  Nunez denied knowledge of the drugs.  However, after Petitioner, his brother, Nash, and Nunez were indicted for conspiracy to possess with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846, both Nunez and Nash pleaded guilty; they agreed to testify against Petitioner as part of their plea deals.

Nunez testified at trial that he took two trips to California for Petitioner and his brother, the first in May 2007 and the second in July 2007.

In May 2007, Petitioner and his brother asked Nunez to accompany Nash to California in exchange for $1,000.  He said he was not told the reason for the trip but he "had an idea" what was in the rear of the truck on the return.  He went to the area of Los Angeles, California in a van and returned to Michigan in a truck.  He further stated that on the return trip he and Nash met Petitioner and his brother at a park just outside of Michigan where the brothers took the truck and paid him.

Nunez also testified that in early July, 2007, he and Nash made a second trip to California for Petitioner and his brother.  He said that while in California, he and Nash took the truck to a farming area where they met Petitioner.  The next day, Nunez and Petitioner went to Wal-Mart in a Honda Civic.  There, Petitioner picked up a bag of packages wrapped in black tape from an unknown individual in a truck in the Wal-Mart parking lot.  Nunez and Petitioner then returned to the farming area to get the truck left

2

there the previous day.  Nunez, Nash, and Nash's children returned to Michigan in the truck with the packages of cocaine.  On July 8, 2007, during the return trip, police performed the traffic stop that resulted in the discovery of the cocaine and the arrests.

Nash testified that on three occasions Petitioner and his brother asked her to drive to Riverside, California to pick up cocaine and bring it to Michigan.  She said she made three trips for the brothers, the latter two with Nunez in May and July, 2007.  She testified to substantially the same events as Nunez.  After her arrest on July 8, 2007, she told agents "everything."

Petitioner testified at his trial.  He admitted he knew Nash and Nunez but denied any involvement in a cocaine smuggling operation.  He said he never asked them to drive to California.  He testified that he was in Mexico from June 22, 2007, to July 26, 2007.  Petitioner said he traveled to Mexico with his sister-in-law, Maria Fe Toledo Verdel, her four children, and his four children.  The purpose of the trip was to obtain his wife's birth certificate and to obtain medical treatment because it was cheaper there. He denied ever having been in San Bernadino, California, and said he had been in Riverside, California but not between June 22 and July 8, 2007.

On December 10, 2008, a jury convicted Petitioner of conspiracy to possess with intent to distribute five kilograms or more of cocaine.  The Court sentenced Petitioner to 120 months imprisonment on May, 18, 2009.

The Sixth Circuit affirmed Petitioner's conviction on September 23, 2010.

**B.     Petitioner's § 2255 Motion to Vacate**

On October 29, 2010, Petitioner filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.

3

Petitioner urged the Court to vacate his conviction on three grounds: (1) prosecutors presented perjured testimony at trial; (2) trial counsel was ineffective for failing to interview and call available witnesses who had information concerning Petitioner's innocence; and (3) Petitioner's indictment was obtained through perjured testimony presented to the grand jury.

In its Order of August 1, 2011, the Court denied Petitioner's first and third grounds for relief.  The Court granted an evidentiary hearing on Petitioner's ineffective assistance of counsel claim.  With respect to that ground for relief, Petitioner argued that trial counsel was ineffective because he failed to investigate available alibi witnesses despite Petitioner's request that he do so.  Petitioner presented affidavits of five other individuals: (1) his sister-in-law Maria Fe Toledo Verdel; (2) his wife Hermelinda Murillo; (3) his father-in-law Jesus Hernandez; (4) his mother-in-law Consuolo Ramirez; and (5) Dr. Melchor Rodelo Biarco, a medical doctor in Mexico who treated Petitioner on June 28, 2007.  Petitioner said that these five witnesses would have testified that he was in Mexico from late June, 2007 through late July, 2007.  This testimony would have rebutted the testimony of Government witnesses Nash and Nunez, who placed Petitioner in California in early July loading drugs.  Additionally, the testimony would have bolstered Petitioner's own testimony that he was in Mexico during that time.

The Government filed an Answer and Brief in Opposition to Defendant's Motion to Vacate Sentence on December 10, 2010.  The Government made several arguments: (1) Because Petitioner took the stand at his trial and stated that he was in Mexico when the crime was committed, any additional testimony to that effect would

4

have been cumulative; (2) The jury made a credibility determination and decided that Petitioner was not believable; (3) Since four out of the five new witnesses were relatives, there was no reason to believe that the jury would have credited their testimony when they chose not to credit Petitioner's; (4) The only non-family affidavit, that of Doctor Biarco, merely established Petitioner's whereabouts on June 28, 2007; it was of no use in establishing his whereabout in early July when he was said to be loading drugs in Riverside, California; and (5) The Government concluded that Mr. Leone was aware of the other witnesses, had doubts about presenting them, and made a *strategic* decision not to call them.  The Government pointed to Mr. Leone's statement to the Court after Petitioner finished testifying: "I have reservations about the witnesses and I think ethically I'm going to rest on it.  I've discussed it with my client and we're going to rest.  He believes it's in his best interest to rest."  For these reason, the Government concluded that Mr. Leone's decision not to call the witnesses was a reasonable strategic decision that did not amount to ineffective assistance of counsel.

### C.    The Evidentiary Hearing

The Court held an evidentiary hearing on Petitioner's ineffective assistance of counsel claim on September 30, 2011.  Court-appointed counsel, Martin J. Beres, represented Petitioner.  Michael Leibson represented the Government.  Mr. Beres called seven witnesses: (1) Andrew Leone, Petitioner's trial counsel; (2) Maria Fe Toledo Verdel, Petitioner's sister-in-law; (3) Consuolo Ramirez, Petitioner's mother-in-law; (4) Jesus Hernandez, Petitioner's father-in-law; (5) Hermelinda Murillo, Petitioner's wife (6) Maritza Machain, a friend of the Murillo family; and (7) Petitioner.

The focus of the hearing was whether Mr. Leone was aware of Petitioner's

5

potential alibi witnesses, and if so, what investigation he conducted.  Further, if Mr. Leone was aware of these potential alibi witnesses, the Court sought to determine the basis for his decision not to call them at Petitioner's trial.

The hearing testimony was highly conflicted.  As explained in greater detail below, Mr. Leone stated that Petitioner could not provide him with particular information regarding his alibi defense, such as whom he was with in Mexico, where they were located, or any contact information for potential alibi witnesses.  Mr. Leone further stated that he met with Ms. Murillo and Ms. Verdel about Petitioner's alibi but that they, too, could not provide specifics, and he had doubts about their veracity.  Ms. Verdel denied that Mr. Leone ever contacted her, or that she had seen him prior to the day of the evidentiary hearing.  Petitioner stated that he gave Mr. Leone a list of potential witnesses with their contact information, including his alibi witnesses, at a meeting well before trial.  Mr. Leone denied seeing the list at any time before the date of the evidentiary hearing.

### i.    Andrew Leone

Mr. Leone testified that he substituted in as Petitioner's counsel on October 10, 2008, two months before trial, and he received Petitioner's files and discovery materials around that time.  He said he visited Petitioner in jail and Petitioner said he believed he was in Mexico with Ms. Verdel during the dates and times in question.  Mr. Leone said that he then set up a meeting with Ms. Verdel in his office.  Petitioner's wife and daughter were present.  Ms. Verdel said she was in Mexico with Petitioner at the time of the crime but was vague on specifics; she could not verify who else was there with them, the dates they drove to Mexico, or where they were in Mexico.  He did not recall

6

whether Ms. Verdel told him that she and Petitioner were with his four children and her four children on the trip.  Mr. Leone said he believed that Ms. Verdel was not telling the truth.

At the conclusion of the meeting, Mr. Leone asked Ms. Verdel and Ms. Murillo to think about the events discussed and to contact him if they recalled any specifics.  He said he specifically asked them if they could provide contact information of individuals in Mexico to corroborate Petitioner's story.  He said they never gave him additional information.

Mr. Leone further testified that he asked Petitioner if he could provide any corroboration for his alibi defense.  He said he specifically asked Petitioner if there was anybody in Mexico Mr. Leone could contact to corroborate his story.  According to Mr. Leone, Petitioner did not provide specific information; he may have indicated a town in Mexico, but nothing more.

Petitioner examined Mr. Leone on a handwritten list of potential witnesses dated November 11, 2008 that Petitioner says he gave to Mr. Leone on that date at the jail.  Mr. Leone said he had never seen the document before the evidentiary hearing..

Mr. Leone testified that he left the door open to calling Ms. Murillo and Ms. Verdel to testify in support of the alibi defense if Ms. Verdel could provide him with specific corroborative information.  He put both of them on the witness list.  However, according to Mr. Leone, Ms. Murillo told him shortly before trial that she did not wish to testify and wanted nothing to do with the trial.  He also said that he spoke to Ms. Verdel once more on the day of trial and that she, too, said that she wanted nothing to do with the trial.

Mr. Leone admitted that his sole trial strategy tactic was cross-examination of

government witnesses.  He sought to discredit Nunez and Nash based upon their agreements to cooperate in exchange for reduced sentences.  Mr. Leone said he had spoken with the Government regarding a possible plea deal but Petitioner insisted on going to trial, despite counsel's warning that "it did not look good."  He said that despite Petitioner's testimony, he never had a plea offer from the Government for 8 months imprisonment.

Mr. Leone said he told Petitioner not to take the stand because he did not believe Petitioner's alibi was truthful.  That said, Mr. Leone admitted that there was no physical evidence connecting Petitioner to the drug deal; the Government's case was based entirely on the testimony of Nash, Nunez, and the government agent who made the traffic stop in which the drugs were discovered.

Mr. Leone testified that he never encouraged the jury to consider an alibi defense during his closing arguments or otherwise.  He said it was a "tactic" at that time not to mention the alibi defense, and that he did not feel comfortable bringing it up.

Mr. Leone testified that he never sent a letter in writing to Petitioner regarding trial strategy.  Nor did he ever send a letter expressing doubts regarding the truthfulness of Petitioner's alibi defense.  Although he did not believe Petitioner's alibi defense was truthful, Mr. Leone testified that his ethical reservations did not rise to the level that would have required him to withdraw from the case.

### ii.    Maria Fe Toledo Verdel

In direct contradiction to Mr. Leone's testimony, Ms. Verdel testified that she never saw Mr. Leone before the day of the evidentiary hearing.  She said she never went to his office for a meeting, never received a telephone call from him, and was

8

never contacted by him to be a witness.  Nor did she ever tell Ms. Murillo or Mr. Leone that she didn't want to have anything to do with the trial.  She said that Ms. Murillo knew where to find her.

Ms. Verdel testified that she would have corroborated Petitioner's alibi defense. She said that during the last week of June, 2007, she drove with Petitioner from Detroit to Mexico with her four children and Petitioner's four children.  She said that they drove to Sinoloa in Mexico and stayed at Petitioner's in-laws' house.  Petitioner stayed in Mexico from the last week of June until the last week of July.  Petitioner was at the house every day and slept there every night.  She said that Petitioner did not take any trips; he stayed at the house the whole time fixing the truck.  At one point he went to visit a doctor but he returned that same day.

### iii.    Consuolo Ramirez and Jesus Hernandez

Petitioner's mother-in-law Consuolo Ramirez testified that she recalled Petitioner's visit to Mexico in the summer of 2007.  She said she did not remember what day he arrived, but that he stayed until the end of July.  He never left the house; he just walked around with his children.

Petitioner's father-in-law said that because of his age he was unable to remember when Petitioner was in Mexico.  He was aware that Petitioner was there but he could not recall the dates.

### iv.    Hermelinda Murillo

Petitioner's wife testified concerning her meeting with Mr. Leone.  Mr. Leone asked questions about the case and discussed being a witness and testifying.  Ms.

Murillo said that Mr. Leone asked if she, her parents, and her sister-in-law were willing to testify at trial.  She said yes, and gave him a list of potential witnesses with their telephone numbers.

Ms. Murillo said that she saw Mr. Leone again on the days of the trial.  She waited in the hallway to be called as a witness.  She never told Mr. Leone that she refused to testify or that Ms. Verdel refused to testify.  She would not have come to the trial if she had refused to testify.  She testified that at the conclusion of the trial Mr. Leone told her that it had not been necessary for her to testify; the judge did not want her to.

### v.    Maritza Machain

Ms. Machain testified that she is a friend of the Murillo family and helped with translation during meetings with Mr. Leone.  She recalled two meetings with Mr. Leone: one at his office and one at the Murillo house.  She did not remember any discussion of Petitioner's case.  She came to the trial and waited outside with Ms. Murillo because Mr. Leone had told her she might be needed to testify.  At the conclusion of the trial, Mr. Leone told her and Ms. Murillo that they were not needed.

### vi.    Sergio Murillo

Petitioner first met Mr. Leone for a brief meeting at the Wayne County Jail shortly after Petitioner's wife hired him.  At this meeting Petitioner informed Mr. Leone that he was not guilty and that he was not in the United States when the crime was committed.

Petitioner next met with Mr. Leone on November 11, 2008.  Mr. Leone brought material to this meeting, including the indictment, grand jury testimony, and proffers.

10

Petitioner said that Mr. Leone wanted him to plead guilty, even though there was little evidence against him. Petitioner testified that Mr. Leone told him that prosecutors offered a term of 8 months imprisonment if Petitioner pled guilty. Petitioner said he told Mr. Leone that he would not plead because he was not guilty. He further told Mr. Leone that he had witnesses in Mexico who would testify that he was in Mexico during the time the crime was committed.

At the evidentiary hearing, Petitioner produced a handwritten list of potential witnesses. He testified that he gave this list to Mr. Leone at the November 11 meeting. The list contained names of witnesses whom Petitioner believed would corroborate his alibi defense. Petitioner testified that his wife had the contact information for the witnesses on the list, and that he told Mr. Leone to talk to his wife to get the contact information.

Petitioner said he met with Mr. Leone again the next day, November 12, 2008. Mr. Leone again said that the Government offered 8 months imprisonment for a plea of guilty. Petitioner still refused to plead guilty and told Mr. Leone to prepare for trial.

The next time Petitioner met with Mr. Leone was the day of trial, December 9, 2008. Petitioner testified that he called Mr. Leone numerous times before trial but was unable to reach him. When they met on the day of the trial, they did not talk about trial strategy or Petitioner's testimony. Petitioner said he testified at trial against Mr. Leone's advice because he wanted the jury to hear where he was.

Petitioner testified that he had in his possession documents that could have corroborated his alibi defense, including records of his doctor appointment in Mexico, records that he received a chauffeur license while in Mexico, and a copy of his wife's

11

birth certificate that he got while he was in Mexico.  He said that he told Mr. Leone that these documents were available, but he never gave them to Mr. Leone because Mr. Leone never came to see him.

Petitioner stated that he never agreed with Mr. Leone to not call his alibi witnesses.  He said that Mr. Leone never informed him that he wasn't going to bring the alibi witnesses to trial.  He further said that he called his wife to tell her to come to trial; Mr. Leone never called her to tell her to be at the trial.

Lastly, Petitioner reaffirmed that he arrived in Mexico on June 22, 2007, and never took a trip to Riverside, California.

### D.   Conclusions of Fact

The Court performed the difficult task of weighing the credibility of the witnesses at the evidentiary hearing, and credits Petitioner's and his family's version of the events.

It appears that Mr. Leone received a list of potential alibi witnesses from Petitioner during their meeting on November 11, 2008.  Ms. Murillo's testimony corroborates this finding; she said that at her initial meeting with Mr. Leone, Mr. Leone asked if she, her parents, and her sister-in-law would be willing to testify.  This testimony suggests that Mr. Leone was aware of the potential alibi witnesses after having met with Petitioner at the jail.  The Court also finds that Mr. Leone was aware of Petitioner's alibi defense as early as their first meeting.  However, after speaking with Ms. Murillo, Mr. Leone unilaterally determined that the alibi was fabricated.  He made no further effort to investigate Petitioner's story or the witnesses that Petitioner provided. His decision not to put on an alibi defense at trial was solely a result of his personal doubts regarding the veracity of Petitioner's story; it was not a product of a reasonable

12

investigation.

The failure of Mr. Leone to even mention Petitioner's alibi testimony during closing arguments likely did not escape the jury's attention. The jury probably concluded that Mr. Leone did not believe his own client's testimony. Mr. Leone could have bolstered his client's alibi testimony by calling alibi witnesses. If he had ethical reservations about the witness's veracity, he could have withdrawn from the case. However, because Mr. Leone made the decision not to investigate Petitioner's alibi defense prior to trial, he chose to not present the evidence. He offered no alternative defense, instead hoping to discredit the prosecution's witnesses through cross-examination.

Petitioner faced a ten year mandatory minimum term of imprisonment for conviction of the drug charge. He would not entertain the possibility of a plea. The fact that he maintained his innocence and chose to go to trial despite the possibility of facing ten years in prison lends credibility to his alibi defense.

Petitioner's witnesses at the evidentiary hearing testified to remarkably consistent stories. Each testified that Petitioner traveled to Mexico in late June, 2007, and left in late July, 2008. Ms. Verdel and Petitioner's in-laws all testified that Petitioner did not leave his in-laws' home in Mexico for more than a few hours at a time. With this testimony, a jury could have believed that Petitioner could not have traveled to Riverside, California, more than a twenty four hour drive away, during the time in question to load drugs.

For these reasons, the Court finds that Mr. Leone was aware of potential alibi witnesses but failed to investigate them and call them at trial.

13

## III.   ANALYSIS

### A.   Standard of Review

Because Petitioner's habeas petition was filed after April 24, 1996, the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132,

110 Stat. 1214 governs this cause.  Under § 2255, a prisoner in custody under sentence

of a federal court may move the court to vacate, correct, or set aside the sentence on

grounds that "the sentence was imposed in violation of the Constitution or laws of the

United States, or that the Court was without jurisdiction to impose such sentence, or

that the sentence was in excess of the maximum authorized by law, or is otherwise

subject to collateral attack."  28 U.S.C. § 2255.  The petitioner bears the burden to show

he is entitled to relief.  *Bowers v. Battles*, 568 F.2d 1, 5 (6th Cir. 1977).

To prevail on a § 2255 motion that alleges constitutional error, the petitioner must

establish an error "of constitutional magnitude which had a substantial and injurious

effect or influence on the proceedings."  *Watson v. United States*, 165 F.3d 486, 488

(6th Cir. 1999).  When the motion alleges non-constitutional error, "the petitioner must

establish a fundamental defect which inherently results in a complete miscarriage of

justice, or, an error so egregious that it amounts to a violation of due process."  *Id.*

(citations and internal quotation marks omitted).  Thus, "[a] motion brought under § 2255

must allege one of three bases as a threshold standard: (1) an error of constitutional

magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or

law that was so fundamental as to render the entire proceeding invalid."  *Weinberger v.*

*United States*, 268 F.3d 346, 351 (6th Cir. 2001).

14

"Normally, sentencing challenges must be made on direct appeal or they are waived." *Weinberger*, 268 F.3d at 351; *see also Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) ("Section 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process."). The general rule is claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice. *See United States v. Frady*, 456 U.S. 152, 167-68 (1982). However, because a defendant claiming ineffective assistance of counsel will often need to develop the district court record, and the district court is better suited than the appellate court to assess the facts related to the adequacy of defense counsel, an ineffective assistance of counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 503-06 (2003).

**B.    Ineffective Assistance of Counsel Claim**

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const., amend. VI. This Sixth Amendment right to counsel is the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685 (1984).

The United States Supreme Court set forth a two-part test to determine whether a defendant received constitutionally ineffective assistance of counsel in *Strickland v. Washington*. First, Defendant must prove that his attorney's performance was deficient. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if it "fell below an objective standard of reasonableness." *Id.* at 688. An objective standard of

15

reasonableness is "reasonableness under prevailing professional norms." *Id.* The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689.

Second, Defendant must show he was prejudiced by this deficiency. *Strickland*, 466 U.S. at 692. To prove prejudice, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. However, Defendant does not have to show "that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.

### i.    Defense Counsel's Performance was Deficient

Petitioner argues that his defense counsel was deficient in two related ways: first, by failing to interview available alibi witnesses; and second, by failing to call available alibi witnesses to testify at trial.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that petitioner was entitled to writ of habeas corpus because defense counsel failed to conduct a reasonable investigation into mitigating evidence with respect to sentencing). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395

16

F.3d 251, 258 (6th Cir. 2005) (citing *Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994)).  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'"  *Towns v. Smith*, 396 F.3d at 258 (citing *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

It is objectively unreasonable for defense counsel to refuse to interview a witness because he doesn't think the witness will be credible.  *Clark v. Redman*, 865 F.2d 257, 1988 WL138971 (6th Cir. 1988) (unpublished).  In *Clark v. Redman*, the sole prosecution witness testified that an individual named Little Jack was with the petitioner at the time the petitioner was alleged to have committed a murder.  In a deposition taken prior to the habeas hearing, Little Jack testified that the petitioner was not with him at that time.  At trial, the petitioner told defense counsel of Little Jack, but counsel refused to interview him because he believed he would not be credible due to his present imprisonment.  In addition, the petitioner informed defense counsel of numerous witnesses in Cleveland who could testify that the petitioner was with them at the time of the murder, away from the crime scene in Detroit.  Defense counsel did not investigate or call the Cleveland witnesses.  In applying *Strickland* and finding defense counsel ineffective, the Sixth Circuit stated:

No reasonably competent trial attorney would have failed at least to interview

17

Little Jack to determine what he had to say and whether he would make a credible witness. Similarly, the Cleveland alibi witnesses, if believed, would have completely exonerated petitioner. No reasonably competent counsel would have failed at least to investigate their stories. *Clark v. Redman*, 1988 WL 138971 at *3.

Like the petitioner in *Clark v. Redman*, Petitioner's alibi witnesses here, if believed, would have completely exonerated him. Yet, like defense counsel in *Clark v. Redman*, Mr. Leone made a conclusory decision not to investigate alibi witnesses because of credibility concerns. This decision fell below the objective standard of reasonableness. If Mr. Leone had investigated Ms. Verdel and Petitioner's in-laws, he would have learned that their testimony corroborated Petitioner's alibi. Mr. Leone was not in a position to evaluate the credibility of these witnesses without first interviewing them and investigating the details of their stories. Additionally, his decision not to call them at trial was not reasonable; it was not based on a reasonable investigation; he was not in a position to make an informed decision whether the testimony of these witnesses would be beneficial to Petitioner's case.

It is also objectively unreasonable for defense counsel to decide not to call a witness without first investigating the witness. *Towns v. Smith*, 396 F.3d at 260. The decision not to call cannot be based on "what counsel guessed the witnesses might say in the absence of a full investigation" and not "on what investigation reveals witnesses will actually testify to." *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (quoting *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007)); *see also Poindexter v. Booker*, 301 Fed.Appx. 522, 528-29 (6th Cir. 2008) (where alibi witness approached trial counsel, and trial counsel was not receptive or interested in their testimony, and did not investigate the alibi witnesses further, trial counsel's investigation was objectively

18

unreasonable); *Avery v. Prelesnik*, 548 F.3d 434, 437-38 (6th Cir. 2008) (where trial counsel's only attempt to contact alibi witness was through an investigator who left it up to the witness to contact counsel, and trial counsel never personally attempted to contact the witness, trial counsel's investigation was objectively unreasonable, because at a "bare minimum" counsel should put forth a reasonable effort to contact witnesses).

What Petitioner's alibi witnesses would have testified to is outlined above.  Ms. Murillo came to trial both days to testify, but Mr. Leone did not call her.  Additionally, Ms. Verdel said that she, too, would have testified if called.  She claimed that she never told Ms. Murillo that she wanted nothing to do with the trial.  Petitioner's in-laws stated in their affidavits that they also would have testified at trial that Petitioner was in Mexico during the time of the crime.  Yet Mr. Leone's decision not to call these witnesses or investigate further seems to have been based on one meeting with Ms. Murillo, and possibly Ms. Verdel if the Court accepts Mr. Leone's version of the facts.  As a result of this meeting, Mr. Leone had doubts about the alibi and did not investigate it further.

Mr. Leone's belief that Ms. Murillo was not credible because she was vague on details cannot justify his decision to not investigate further.  "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)). Here, Mr. Leone's decision not to pursue the alibi defense was based on a mere hunch; such a feeling cannot form the basis of a reasonable strategic decision.

Counsel has a duty to investigate *all known* alibi witnesses.  *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987).  In *Blackburn*, defendant gave his counsel names

19

of three alibi witnesses and said his mother could also help with an alibi defense.  *Id.* at

1182-83.  Counsel said that he contacted defendant's mother and made an

unsuccessful attempt to contact one of the three other alibi witness, but then did not

investigate the alibi any further.  *Id.*  In holding that it was unreasonable for counsel to

stop his investigation of the alibi at this juncture, the Sixth Circuit noted that "American

Bar Association standards, which provide guidance as to what constitutes 'reasonable'

professional conduct, . . . also mandate counsel's duty to investigate all leads relevant

to the merits of the case."  *Id.* at 1183 (citing ABA Standard for Criminal Justice 4-4.1,

4.54-4.55 (1980)).  It is objectively unreasonable for counsel to abandon an

investigation at a time that makes making a fully informed decision impossible.

*Wiggins*, 539 U.S. at 527-28.

Mr. Leone abandoned his investigation of Petitioner's alibi at an unreasonable

juncture–after one meeting with Petitioner's wife.  Mr. Leone's decision not to pursue

additional leads was objectively unreasonable.

Moreover, even if the Court believed Mr. Leone's account that Ms. Murillo and

Ms. Verdel stated they wanted nothing to do with the trial, this does not make his

decision not to investigate the alibi defense reasonable.  *See Ward v. United States*,

995 F.2d 1317, 1321-22 (6th Cir. 1993) (*Strickland* analysis is "judicial evaluation of

counsel's performance in accordance with an objective standard of reasonableness as

measured against the prevailing norms of the legal community.").  Where, as here, an

alibi defense has sufficient indicia of reliability, counsel has a duty to fully investigate the

defense regardless of whether any witnesses, or even the defendant himself, do not

cooperate.  It is not reasonable to simply abandon the defense without performing an

investigation into its merits, especially where, as here, the defense is a rock-solid alibi to the crime.

Additionally, it is not a reasonable strategic decision for defense counsel to withhold alibi witnesses because counsel believes he will successfully discredit prosecution witnesses through cross-examination. *Caldwell v. Lewis*, 414 Fed.Appx. 809, 2011 WL 915764 (6th Cir. 2011) (unpublished). In *Caldwell*, defense counsel had alibi witnesses available to testify but, nevertheless, put on no proof. Defense counsel's reason for not calling the alibi witness was that he believed he had "completely discredited" a key witness for the prosecution. *Id.* at 812. In finding counsel's performance deficient, the Sixth Circuit held that this explanation did "not provide a tactical justification for their failure to have these witnesses testify at trial." *Id.* at 816.

At the evidentiary hearing, Mr. Leone admitted that his trial strategy consisted of nothing but cross-examining prosecution witnesses. Mr. Leone discouraged Petitioner from taking the stand and testifying to his alibi defense, despite the fact that Mr. Leone offered no alternative defense. After Petitioner took the stand, Mr. Leone failed to argue the alibi defense to the jury. Yet, Mr. Leone could have called Ms. Murillo, who was waiting outside of the courtroom, to corroborate Petitioner's story. He also could have sought a continuance in order to investigate Ms. Verdel and Petitioner's parents in-law and bring them to testify if necessary. Of course, if he had properly investigated the alibi defense prior to trial, a continuance would not have been necessary. Under these facts, Mr. Leone's decision to rely solely on cross-examination of prosecution witnesses–when a potentially strong alibi defense was available–was objectively unreasonable.

21

Corroborating testimony is important to lend credibility to a defendant's own alibi testimony; therefore, the cumulative nature of the testimony would have been helpful to Petitioner.  *See Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004) ("Had even one alibi witness been permitted to testify on [Defendant's] behalf, [Defendant's] 'own testimony would have appeared more credible because it coincided in important respects with those of his alibi witnesses.'"); *see also English v. Romanowski*, 602 F.3d 714, 727 (6th Cir. 2010) ("Undoubtedly, the testimony of a second person to corroborate the Defendant's version of the events would not have been cumulative, but rather could have critically added to the strength of the defense's case."); *Bigelow v. Williams*, 367 F.3d 562, 574-75 (6th Cir. 2004) (finding multiple alibi witnesses not cumulative to defense despite fact that one other witness already testified to same facts.).

All of the witnesses at the evidentiary hearing would have critically bolstered Petitioner's defense, especially since the entire case turned on whether the jury believed Petitioner's alibi.

Generally speaking, deciding not to present a certain defense or witness in support is a strategic decision that, if reasonable, amounts to sound trial strategy; here, however, there are no facts indicating how Mr. Leone concluded that his decision not to call alibi witnesses was reasonable without fully investigating the witnesses.  The evidence indicates that Mr. Leone performed a cursory initial interview with Ms. Murillo before deciding to abandon the alibi defense.  He did not interview Ms. Verdel, or Petitioner's in-laws.  Further, the testimony of Ms. Verdel and Petitioner's in-laws would have been more probative than Ms. Murillo's since they claimed to be in Mexico with Petitioner at the time of the crime.  It is unclear how Mr. Leone could have made a fully

22

informed decision not to put on an alibi defense without investigating key witnesses.

### ii.  Petitioner Was Prejudiced by Counsel's Deficient Performance

Trial counsel's performance was deficient in both failing to investigate and call available alibi witnesses; Petitioner must now show that he was prejudiced by this deficient performance.

To prove prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "[A] 'reasonable probability' does not mean a certainty, or even a preponderant likelihood, of a different outcome, nor even more, that no rational juror could constitutionally find [the defendant] guilty."  *Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003) (internal citations omitted).

"To evaluate a claim of prejudice, the court must assess how reasonable jurors would react to the additional alibi testimony had it been presented."  *Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008).  However, the Court does not decide whether the jury would be likely to believe the testimony of the alibi witnesses because "our Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence."  *Ramonex v. Berghuis*, 490, F.3d 482, 490 (6th Cir. 2007).  Instead, the Court determines whether the testimony of Petitioner's alibi witnesses, if believed, undermines confidence in the jury verdict.

It is worth noting that the actual evidence of Petitioner's guilt in this case is not overwhelming.  No physical evidence linked Petitioner to the crime.  The Government's

entire case turned on the testimony of two eyewitnesses, Nash and Nunez, both of whom received reduced sentences for their testimony against Petitioner. Nunez has since signed an affidavit recanting his trial testimony, and stating that he lied to receive a shortened sentence.

The Supreme Court explained that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466. U.S. at 696; *see also English v. Romanowski*, 602 F.3d 714, 731 (6th Cir. 2010); *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004); *Clark v. Redman*, 865 F.2d 257, 1988 WL 138971 at *4 (6th Cir. 1988) (unpublished). In addition, the Sixth Circuit has repeatedly expressed "grave reservations concerning the reliability of eyewitness testimony." *Clinskscale*, 375 F.3d at 445 (quoting *Blackburn*, 828 F.2d at 1186). Petitioner's guilty verdict was supported solely by the accounts of two eyewitnesses, both of whom had motive to lie, and one of whom recanted. Petitioner's verdict was only "weakly supported by the record."

Failure to call an alibi witness is particularly likely to result in prejudice to the defendant. The Sixth Circuit recognized that "when trial counsel fails to present an alibi witness, '[t]he difference between the case that was and the case that should have been is undeniable.'" *Caldwell v. Lewis*, 414 Fed.Appx. 809, 2011 WL 915764 (6th Cir. 2011) (unreported) (quoting *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006)). The Sixth Circuit has also held that failure to call alibi witnesses was prejudicial, even where the state postconviction court said the witnesses would have been "unconvincing." *Bigelow v. Haviland*, 576, F.3d 284, 291 (6th Cir. 2009).

24

The alibi evidence here was powerful.  If Petitioner's alibi witnesses are to be believed, they present a complete defense to the crime.  There is at least a reasonable probability that the result of the trial would have been different had counsel presented Petitioner's alibi witnesses.

## IV.    CONCLUSION

Petitioner was denied the effective assistance of counsel in violation of his Sixth Amendment rights.  Accordingly, the Court **CONDITIONALLY GRANTS** the petition to vacate, set aside, or correct his sentence.  The Government must either release Petitioner, or institute proceedings to retry him within 90 days of the filing date of this Order.  If the Government fails to do so, Petitioner may move for an unconditional writ seeking immediate release from custody.  If the Government appeals this Order to the United States Court of Appeals for the Sixth Circuit, this Order is stayed pending disposition of that appeal.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  October 24, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 24, 2011.

S/Linda Vertriest
Deputy Clerk

25